UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

SECURITIES AND EXCHANGE COMMISSION,

   Plaintiff,

v.

AMIT MATHUR,
and ENTRUST CAPITAL MANAGEMENT, INC.,

   Defendants,

AMR REALTY, LLC,

   Relief Defendant.

: CIVIL ACTION No. _____

: **Emergency Motion**
: **Hearing Requested**

: 05 - 10729 MLW

---

### PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF LAW IN SUPPORT OF ITS EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, ORDER FREEZING ASSETS AND OTHER EQUITABLE RELIEF

Plaintiff Securities and Exchange Commission ("Commission" or "SEC") hereby respectfully submits this memorandum in support of its Emergency Motion for a Temporary Restraining Order, Preliminary Injunction, Order Freezing Assets and Other Equitable Relief to protect investors from an ongoing fraud involving Defendants Amit Mathur ("Mathur") and Entrust Capital Management, Inc. ("Entrust") and Relief Defendant AMR Realty, Inc. ("AMR Realty").

### PRELIMINARY STATEMENT

This is an emergency motion to stop defendants Mathur and Entrust from continuing their fraudulent activities and to prevent further misappropriation of investor funds by the Defendants and dissipation of investor assets by Relief Defendant AMR Realty. Since at least September 2001, Mathur, thorough Entrust, pooled almost $16 million from approximately fifteen

individuals to fund investments in publicly traded securities and real estate ventures. Unfortunately for his investors, however, Mathur and Entrust have dissipated nearly all of the investors' assets through undisclosed trading losses, unauthorized use of clients' funds for Entrust business expenses, and blatant misappropriation of their funds. As of April 5, 2005, Entrust's total assets appear to be worth no more than $785,000, of which, less than $325,000 is liquid assets.

Entrust's brokerage records show that since early 2002, the firm has consistently lost money through securities trading -- more than $5.3 million. Over the last three years, however, Mathur caused Entrust to send out fraudulent and misleading account statements to at least four investors (the "Core Investors"), who account for more that $15 million of Entrust's pool of funds. The bogus account statements replaced Entrust's negative performance with positive results, and thereby substantially inflated the purported value of the Core Investors' investments. Instead of telling the Core Investors about the massive trading losses, Mathur and Entrust have repeatedly told the Core Investors in writing and orally that their principal remained intact and in fact, enjoyed substantial growth over the last three years. Acting on their faulty understanding of Entrust's investment performance, the Core Investors invested additional funds with Mathur at Entrust.

Entrust and Mathur appear to have misled the Core Investors as to the value of their investments, at least in part to hide their massive misuse and misappropriation of their investors' funds for Mathur's personal benefit. As indicated above, over the last three years, Entrust has taken in almost $16 million in investor funds. Over the same time period, Entrust has made client redemptions of $3.5 million and lost approximately $5.3 million in unsuccessful securities

2

trading. As of April 5, however, the firm's combined assets, including assets held for its benefit at AMR Realty, were worth less than $785,000 leaving an unexplained loss of $6.4 million.

|  9/1/02 to 4/5/05 | |
| --- | --- |
| Investor Deposits with Entrust | $16,000,000 |
| Less Money Returned to Investors | -$3,500,000 |
| Less Losses Due to Market Trading | -$5,300,000 |
| Less Entrust's Net Worth on 4/5/05 | -$785,000 |
| Unexplained Loss of Investor Funds | $6,415,000 |

The unaccounted for $6.4 million of investor funds is simply gone, apparently used by Entrust to fund corporate expenses and misappropriated by Mathur for his personal benefit. Mathur has asserted his Fifth Amendment right against self-incrimination in response to all questions concerning his and the firm's representations to clients concerning Entrust's investment performance and its apparent misappropriation of clients' investments. Corporate bank records, however, show Mathur making direct payments to himself of almost $3 million in the form of checks, cash and ATM withdrawals, a significant portion of which appears to have funded several gambling junkets, as well as the purchase of a Porsche Cayenne Sport Utility Vehicle. The remaining investor funds appears to have been paid out by Entrust and AMR Realty in the normal course of business to a variety of vendors, although the Plaintiff believes that with additional discovery it will be able to show that much of the money was paid out for the direct or indirect benefit of Mathur.

A Temporary Restraining Order and Preliminary Injunction against Mathur and Entrust are necessary and appropriate given the Commission's likelihood of success on the merits, the blatant nature of Mathur and Entrust's fraud, and the likelihood that if the Court does not enter the requested orders, the Defendants will continue to violate the securities laws and that they and the Relief Defendant will further dissipate the investors remaining funds. Accordingly, the Commission respectfully requests that this Court issue a Temporary Restraining Order barring

Mathur and Entrust from engaging in further fraudulent conduct and freezing the assets of the Defendants and Relief Defendant AMR Realty. The Commission further requests that the Court schedule a hearing on the Commission's Motion for a Preliminary Injunction prior to the expiration of the Temporary Restraining Order and grant the other equitable relief requested including allowing the Commission to take expedited discovery.

## STATEMENT OF FACTS

### 1. Background

Mathur formed Entrust in 1998 and is the company's owner and president. (Primavera Decl. at ¶ 5.)[1] Entrust is a Massachusetts corporation with offices in Worcester, Massachusetts and West Monroe, Louisiana. (*Id.*; Beazer Decl. at ¶ 3.) Entrust's Articles of Organization state that the purpose of the company is, *inter alia*, "to engage in the business of managing money" and the company presents itself to the public as a "hedge fund." (Primavera Decl.at ¶ 5 and Ex. B.) Since September 2001, Mathur has taken in approximately $16 million at Entrust from approximately fifteen investors. (Primavera Decl. at ¶¶ 9, 14.) Mathur and Entrust pool the investors' money together (i.e. each investor does not have a separate account) to invest in marketable securities and/or real estate ventures. (Entrust Exam. Resp. No. 30, Ex. B to Leung Decl.) According to Mathur, he oversees the real estate investments while his partner in Louisiana, Rajeev Johar ("Johar"), manages the trading of marketable securities in a so-called hedge fund. (Beazer Decl. at ¶ 3, 7.) Mathur and Johar are the only two employees of Entrust.

Entrust purportedly charges its clients a fee for its investment services equal to "1% of assets [under management] and 10% of profits." (Entrust Exam Resp. No. 26, Ex. B to Leung Decl.) Johar has told SEC staff, however, that because of Entrust's poor performance in its

---

[1] In support of this memorandum the Plaintiff submits herewith an Evidentiary Appendix containing Declaration of Corliss A. Primavera, Declaration of Risa A. King, Declaration of Kenneth G. Leung, Declaration of Philmore S. Beazer, Declaration of William S. Walker.

4

brokerage account, he and Mathur decided not to charge their clients any management fees, and furthermore, he has not drawn any salary from Entrust.[2] (Leung Decl. at ¶ 5.) Given Entrust's heavy trading losses, Entrust also failed to earn any performance fees. Coupled with Entrust's decision not to charge a management fee, Entrust was not entitled to use any investor funds.

### 2.  **Entrust's Marketable Securities Investments**

Entrust purchases and holds marketable securities in a brokerage account at Kimball & Cross Investment Management Corp. ("K&C"). (Entrust Exam. Resp. No. 32, Ex. B to Leung Decl.; Leung Decl. at ¶ 6.) The K&C brokerage account is the only account that Entrust has used to buy and sell securities. (Leung Decl. at ¶ 6; Beazer Decl. at ¶¶ 8-9.) Entrust's securities trading activities have been unsuccessful over the last three years, generating negative returns in almost every quarter and double-digit negative returns on an annual basis. (Leung Decl. at ¶¶ 9-27 and Ex. C.)

---

[2]  Mathur has made similar representations related to Entrust's real estate investments, stating that as of January 20, 2005, he had not taken any salary or charged investors any fees related to any real estate investments, but that they would be charged a fee equal to 5% of the profits of any development deal that was expected to close in early 2005. (Beazer Decl. at ¶ 6.)

The following is a summary of the activity in the Entrust K&C account:

| Entrust Kimball & Cross Account Summary | | | | | |
|---|---|---|---|---|---|
| Quarter Ending | Total Portfolio Value[3] | Quarterly Profit/(Loss)[4] | Year to Date Profit/(Loss) | Quarterly ROR[5] | YTD ROR |
| 3/31/02[6] | $351,580.98 | ($11,384.10) | ($11,384.10) | (29.4%) | (29.4%) |
| 6/30/02 | $151,812.14 | ($211,768.84) | ($223,152.94) | (59.9%) | (71.7%) |
| 9/30/02 | $14,200.83 | ($92,511.31) | ($315,664.25) | (64.1%) | (89.8%) |
| 12/31/02 | $197,791.77 | ($4,409.06) | ($320,073.31) | 28.5% | (86.9%) |
| 3/31/03 | $869.47 | ($74,922.30) | ($74,922.30) | (48.7%) | (48.7%) |
| 6/30/03 | $353.58 | ($515.89) | ($75,438.19) | (59.3%) | (79.1%) |
| 9/30/03 | $6,399,785.86 | $362,028.73 | $286,590.54 | 11.0% | (76.8%) |
| 12/31/03 | $9,865,672.07 | ($1,373,863.79) | ($1,087,273.25) | (16.5%) | (80.7%) |
| 3/31/04 | $7,797,743.23 | ($1,484,538.84) | ($1,484,538.84) | (15.3%) | (15.3%) |
| 6/30/04 | $5,486,682.67 | ($1,663,359.04) | ($3,147,897.88) | (21.8%) | (-33.7%) |
| 9/30/04 | $1,861,549.97 | ($129,238.84) | ($3,277,136.72) | (6.6%) | (38.1%) |
| 12/31/04 | $615,666.46 | ($520,492.96) | ($3,797,629.68) | (43.7%) | (65.2%) |
| 3/31/05 | $112,322.70 | (142,953.21) | (142,953.21) | (45.4%) | (45.4%) |
| **Profit/(Loss) 2/1/02 to 3/31/05** | | | ($5,347,929.45) | | |

3. **Entrust's Real Estate Investment**

Mathur uses another Massachusetts company that he founded in 2003, AMR Realty, to conduct Entrust's real estate investments. (Beazer Decl. at ¶ 4; Primavera Decl. at ¶ 6.) Between July 28, 2003 and January 28, 2005, Mathur transferred $1.023 million from Entrust's bank account to AMR Realty's bank account. (Primavera Decl. at ¶ 18; Beazer Decl. at ¶ 3-4.) AMR Realty has purchased three properties, all in Worcester. (Beazer Decl. at ¶ 3-4; Primavera Decl. at ¶ 22-23.) One of the properties, located at 3 Hathaway Street, Worcester was purchased

---

[3] Total net value of all assets held in the Entrust K&C account.

[4] The profit/(loss) of a period is equal to: [period's ending balance] − [period's beginning balance] − [additions during the period] + [withdrawals during the period].

[5] The Rate of Return ("ROR") was calculated on a monthly basis using the Modified-Dietz method and then used to determine quarterly and year-to-date ("YTD") returns.

[6] The data presented for the period ending March 30, 2002, only includes activity during February and March 2002. Statements from January 2002 were not available.

in June 2003 for $156,000 and sold three months later for $280,000. (Primavera Decl. at ¶ 22.) AMR Realty also purchased property on Palace Gardens Road, Worcester for $480,000 on November 5, 2003 and sold at least a portion of the parcel for $258,000 on December 17, 2003. (Primavera Decl. at ¶ 22.) AMR's third transaction was the purchase of property on Wildwood Street, Worcester for $320,000 on September 18, 2003. (*Id.*) AMR Realty developed the Wildwood parcel into eight townhouses which sold in 2005, generating more than $1.7 million in revenues. (Beazer Decl. ¶ 4; Primavera Decl. at ¶ 23.)

Mathur has indicated that with respect to the real estate investments, the firm will receive 5% of the profits with the investors to receive the remainder. (Beazer Decl. at ¶ 6.) Mathur has supposedly not drawn a salary and his firm had supposedly not taken any fees associated with the real estate work through at least January 2005. (*Id.*) Although Entrust's real estate projects seem to have resulted in profits, none of the money appears to have been returned to investors.

4.   **Misstatements to the Core Investors**

Over the last three years, Mathur and Entrust have materially misled at least four investors, David Massad, Phillip Massad, Pamela Massad, and Suzanne Benoit (collectively the "Core Investors") as to value of their investments and the performance of Entrust in managing their money.[7] The Core Investors represent more than $15 million of the approximate $16 million in investor funds that Mathur has collected at Entrust. (Primavera Decl. at ¶ 15.) Although as indicated above, Entrust's securities trading activities have generated substantial losses, Mathur, on numerous occasions since at least early 2002, has provided written and oral statements to the Core Investors indicating that not only has Entrust preserved their principal, but

---

[7] David Massad is Phillip Massad's brother, Pamela Massad's father, and Suzanne Benoit's uncle. (King Decl. at ¶ 3).

in fact it had generated substantial positive returns. (King Decl. at ¶¶ 6, 12, 15, 18, 22, 25, 30-32.)

### A.  Specific Misrepresentations to David Massad and Phillip Massad

David Massad is a business owner in the Worcester area and over that last three years he has invested more than $10 million with Mathur at Entrust in several increments.[8] (Primavera Decl. at ¶ 15; King Decl. at ¶¶ 5-6.) David Massad has also received redemptions of approximately $3 million from Entrust. (King Decl. at ¶ 5.)  Phillip Massad is also a business owner in the Worcester area and he invested almost $200,000 with Mathur at Entrust also in several increments. (King Decl. at ¶ 11; Primavera Decl. at ¶ 15.) Over the last several years, Mathur and Entrust sent David Massad and Phillip Massad written statements indicating that their investment was continually growing via positive returns.[9] (Ex. A to King Decl.; King Decl. at ¶¶ 6, 12-13.) Phillip Massad's account statements from Entrust and Mathur stated that his investment made 13.6% in 2002 and 18.07% in 2004. (Ex. A to King Decl..; King Decl. at ¶¶ 12-13.) Philip Massad's year end 2004 statement showed that his Entrust investment, entirely in equities and options, was worth approximately $348,000. (Ex. A to King Decl.) Mathur also orally confirmed Entrust's purported positive performance to both David Massad and Phillip Massad. (King Decl. ¶¶ 5, 15, 18.)

As described above, however, Entrust's trading activities generated negative returns and millions of dollars of losses, and thus, Mathur's and Entrust's statements to David Massad and

---

[8] When interviewed, David Massad only recalled making approximately $10 million in investments. A review of Entrust's bank and brokerage records puts the number at approximately $14.3 million. (King Decl. at ¶6.)

[9] The SEC staff have informally interviewed David Massad and Phillip Massad by phone on several occasions. David Massad has informed the SEC's staff that he believes he has copies of statements provided by Entrust but the staff has not been able to obtain the materials because his counsel is on trial through April 12, 2005 and unable to devote time to this matter till then. Counsel for Entrust did provide the SEC with statements that David Massad supposedly received, but David Massad's counsel indicated that those materials may be unreliable. Phillip Massad's copies of the statements he received from Mathur and Entrust are Exhibit A to King's Declaration.

8

Phillip Massad related to the purported positive returns were fabrications. Moreover, Entrust's internal records show that at year-end 2004, the firm considered David Massad's investment to have declined to $1.2 million and Phillip Massad's investment to be worth less than $125,000. (Ex A to Leung Decl.)

### B.   Specific Misrepresentations to Pamela Massad and Suzanne Benoit

Pamela Massad and Suzanne Benoit are both attorneys in Worcester. (King Decl. at ¶¶ 19, 27.) Pamela Massad has invested $400,000 with Mathur at Entrust, making an initial investment of $100,000 in September 2001 and then an additional investment of $300,000 in March 2002. (King Decl. at ¶ 21.) Suzanne Benoit has invested $75,000 with Mathur at Entrust, making an initial investment of $25,000 in September 2002, and then additional investments of $10,000 in August 2002, $15,000 in October 2003, and $25,000 in January 2004. (King Decl. at ¶ 29.)

Since at least early 2002, Pamela Massad and Suzanne Benoit have received statements from Entrust shortly after the end of every calendar quarter.[10] (Copies of Pamala. Massad's and Suzanne Benoit's Entrust Statements as Exs. B and C to King Decl.) The statements list the classes of assets in which Entrust has purportedly invested and provides a summary of Entrust's quarterly and year-to-date investment performance, as well as a statement of the worth of the investor's investment with Entrust. (*Id.*) The single page statements all appear to have been accompanied by a newsletter signed by Mathur. (*Id.*) The newsletter repeated the performance figures found in the periodic statements and generally described the types of investments that Mathur was making in the Entrust portfolio, as well as a discussion of general investment and

---

[10] Surprisingly, when it provided a list all of its investors to the staff, Entrust failed to identify Pamela Massad or Suzanne Benoit. (Ex. A to Leung Decl.)

economic conditions. (*Id.*) The Entrust statements retained by Pamela Massad and Suzanne Benoit reported the following results:

| Statement Date[11] | PAMELA MASSAD | | | SUZANNE BENOIT | | |
|---|---|---|---|---|---|---|
| | Capital Value | QTR Return | YTD Return | Capital Value | QTR Return | YTD Return |
| 10/1/2001 | $101,268.82 | 1.26% | 1.26% | | | |
| 12/31/2001 | $109,610.35 | 8.23% | 9.61% | $27,147.50 | 8.59% | 8.59% |
| 3/31/2002 | $416,515.80 | 6.30% | 6.30% | $28,857.79 | 6.30% | 6.30% |
| 6/30/2002 | | | | $30,012.10 | 4.00% | 10.55% |
| 9/30/2002 | $447,038.07 | 3.20% | 9.14% | $41,292.49 | 3.20% | 14.09% |
| 12/31/2002 | $478,330.73 | 7.00% | 15.37% | $44,182.96 | 7.00% | 17.04% |
| 3/31/2003 | $491,341.32 | 2.72% | 2.72% | $45,384.74 | 2.72% | 2.72% |
| 6/30/2003 | | | | $49,855.13 | 9.85% | 12.84% |
| 9/30/2003 | $576,872.44 | 6.88% | 20.60% | $53,285.16 | 6.88% | 20.60% |
| 12/31/2003 | $616,561.26 | 6.88% | 23.96% | | | |
| 3/31/2004 | $654,664.74 | 6.18% | 6.18% | | | |
| 6/30/2004 | $676,072.28 | 3.27% | 9.09% | $107,208.00 | 3.27% | 9.09% |
| 9/30/2004 | $690,743.05 | 2.17% | 10.97% | $109,534.90 | 2.17% | 10.97% |
| 12/31/2004 | | | | $115,438.83 | 5.39% | 24.28% |

The statements that Mathur and Entrust sent to Pamela Massad and Suzanne Benoit are poor fabrications that bear no semblance to reality. The statements show consistent trading profits when Entrust's brokerage account shows substantial losses. (Compare Massad/Benoit Reported Performance Chart with Entrust K&C Performance Chart.) In other instances, for example, in the third and fourth quarters of 2002 and the first quarters of 2003, the combined value of Pamela Massad's and Suzanne Benoit's investments, which are supposedly only made up of marketable securities, greatly exceeds the actual portfolio value of the entire Entrust K&C account.

---

[11] Blank fields indicate dates for which Pamela Massad or Suzanne Benoit did not retain statements.

10

The newsletters signed by Mathur that accompanied the account statements sent to Pamela Massad and Suzanne Benoit are likewise full of misrepresentations. For example, the newsletter that came in early 2004 with the year-end 2003 statement is addressed "Dear Investors" and notes, *inter alia*:

> Our portfolios had another positive quarter 6.88% return, and we closed out the year with a 23.96% return. . . . Fortunately, our balanced approach, and our exposure to other 'safer' areas of the markets, allowed us to generate substantial gains without taking on the additional risk.

Mathur goes on for several paragraphs with a technical analysis of the stock market and federal reserve policy, which although it appears to be an intelligent discourse has nothing to do with the investment strategies employed at Entrust and was in fact copied verbatim from a March 5, 2004 commentary posted on a Morgan Stanley website. (*Compare* Mathur's Year-End 2003 Newsletter found at Exhibit C to King's Decl., *with* Stephen Roach, *A Time for Courage*, Mar. 5, 2004 found at http://www.morganstanley.com/GEFdata/digests/20040305-fri.html on Apr. 9, 2005).

### 5. <u>Misappropriation of Investors' Assets & Other Breaches of Fiduciary Duty</u>

Between September 2001 and April 2005, Mathur and/or Entrust misappropriated approximately $3.1 million in investor funds from the Entrust and AMR bank accounts at Commerce Bank. (Primavera Decl. at ¶¶ 18-19, 21, 25). Nearly all of Entrust's assets in its corporate account at Commerce Bank account were advisory client funds. (Primavera Decl. at ¶¶ 15, 17). Between September 2001 and April 5, 2005, Mathur and Entrust misappropriated approximately $2.3 from Entrust's corporate bank account at Commerce Bank. (Primavera Decl. at ¶¶ 18-19). Of that amount, approximately $1 million consisted of checks made out to Amit Mathur, and approximately $273,000 consisted of bank withdrawals by Mathur. (Primavera Decl. at ¶ 19). Mathur also made approximately $355,000 in ATM withdrawals from various

11

localities, including Las Vegas, Atlantic City, and the Foxwoods and Mohegan Sun casinos in Connecticut. (Primavera Decl. at ¶ 19). The bank records also reveal that tens of thousands of dollars were spent at jewelry stores, a Porsche dealership, and for New England Patriots tickets. (Primavera Decl. at ¶¶ 18, 21). In addition, over $300,000 was used to pay corporate or personal credit card bills. (Id.)

Nearly all of AMR Realty's assets in its corporate account at Commerce Bank consisted of transfers from Entrust's corporate bank account, bank loans, and apparent proceeds from real estate sales proceedings. (Primavera Decl. at ¶¶ 17-21). Between July 2003 and April 5, 2005, Mathur misappropriated up to $800,000 from AMR Realty's corporate bank account at Commerce Bank, and thereby misappropriated Entrust investors' money. (Primavera Decl. at ¶ 21). Of that amount, approximately $318,000 consisted of checks made out to Amit Mathur, and approximately $433,000 consisted of bank and cash withdrawals by Mathur. (Id. at ¶ 21). The bank records also reveal that over $20,000 was spent at jewelry stores. (Id. at ¶ 21). During his investigative testimony on April 1, 2005, Mathur asserted his Fifth Amendment right against self-incrimination in response to all questions concerning misappropriation of client funds and the use of client funds for personal use. (Ex. A to Primavera Decl.).

## ARGUMENT

1. **A Temporary Restraining Order and A Preliminary Injunction Against Mathur and Entrust Are Necessary and Appropriate To Protect Investors and The Public Interest.**

This Court should issue a temporary restraining order and preliminary injunction against Mathur and Entrust to stop their continuing fraudulent conduct and misappropriation of investor assets. Under Section 209(d) of the Advisers Act, the Commission may bring an injunctive action in the proper district court upon a "showing" that provisions of the Advisers Act have

12

been, or are about to be, violated. 15 U.S.C. §80b-9(d); see also 15 US.C. § 77t(b) (same authority under the Securities and Exchange Act of 1933); 15 U.S.C. § 78u(d) (same authority under the Securities Exchange Act of 1934). Because the Commission is "not ... an ordinary litigant, but ... a statutory guardian charged with safeguarding the public interest in enforcing the securities laws," its burden to secure temporary or preliminary relief is less than that of a private party. SEC v. Management Dynamics, Inc., 515 F.2d 801, 808 (2d Cir. 1975). The Commission need not show irreparable injury or a balance of equities in its favor. Id; see also, SEC v. Unifund SAL, 910 F.2d 1028, 1035 (2d Cir. 1990).

A proper "showing" for preliminary injunctive relief requires that the Commission establish: (1) a substantial likelihood of success on the merits; and (2) a reasonable likelihood that the wrong will be repeated. SEC v. Margolin, 1992 WL 279735, *2 (S.D.N.Y. Sept. 30, 1992) (granting preliminary injunction in action brought pursuant to Section 209(d), Section 21(d) of the Exchange Act, and Section 20(b) of the Securities Act based on a showing of "substantial likelihood of success as to both a current violation and the risk of repetition"); see also SEC v. Pinez, 989 F. Supp. 325, 333 (D. Mass. 1997), remanded on other grounds sub nom. SEC v. Lehman Bros., Inc., 157 F.3d 2 (1st Cir. 1998) (applying the same standard in an action brought under Section 21(d) of the Exchange Act which contains similar language to Section 209(d)); SEC v. Mgmt. Dynamics, Inc., 515 F.2d 801, 807 (2d Cir. 1975) (same); SEC v. International Loan Network, Inc., 770 F. Supp. 678, 688 (D.D.C. 1991), aff'd, 968 F. 2d 1304 (D.C. Cir. 1992) (same); SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1100 (2d Cir. 1972) (same).

When viewed under this standard, the compelling facts and circumstances of this case clearly establish that the Commission is entitled to both a temporary restraining order and other

emergency relief sought against Mathur and Entrust. This relief is necessary to preserve the status quo, prevent the defendants from continuing their fraudulent conduct, protect any remaining investor funds and protect documents and other evidence from destruction or alteration.

### A. The Commission Has Established a Substantial Likelihood that Defendants Violated of Section 206(1) and 206(2) of the Advisers Act

Mathur, directly and indirectly through Entrust, has violated the antifraud provisions of Section 206 of the Advisers Act. Section 206(1) of the Advisers Act prohibits an investment adviser from employing "any device, scheme or artifice to defraud any client or prospective client." 15 U.S.C. §80b-6(1). Section 206(2) prohibits an adviser from engaging "in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." 15 U.S.C. §80b-6(2). A showing of scienter is required to establish a violation of Section 206(1), but is not required for violation of Section 206(2). SEC v. Capital Gains Research, Inc., 375 U.S. 180, 191-92 (1963); SEC v. Steadman, 967 F.2d 636, 643 & n.5 (D.C. Cir. 1992); Messer v. E.F. Hutton & Co., 847 F.2d 673, 679 (11th Cir. 1988). In this Circuit, a showing of recklessness is sufficient to establish scienter. Greebel v. FTP Software, Inc., 194 F.3d 185, 198 (1st Cir. 1999).

#### 1. Mathur and Entrust are Investment Advisers

Section 202(a)(11) of the Investment Advisers Act defines the term "investment adviser" as "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities." 15 U.S.C. § 80b-2 (a)(11). Mathur and Entrust are in the business of advising others as to securities investments. Entrust's Articles of Organization state that it was organized "to engage in the business of managing money." The

14

statements that Mathur and Entrust sent to their clients and the accompanying letters make it clear that they are providing investment advice. The firm, acting through Mathur and others, provides advice and makes decisions related to securities purchases and other investments on behalf of its clients (e.g. the Core Investors and other who have invested in Entrust). This service is provided in return for a fee, even if in this case it was a misappropriated fee, and thus, Mathur and Entrust are investment advisors.

### 2.  Defendants Violated Section 206 (1) and (2) of the Advisers Act

Mathur and Entrust violated the antifraud provisions of the Advisors Act by misappropriating investor funds and fabricating performance and investment value numbers to the Core Investors in written and oral statements. Investment advisers, such as Mathur and Entrust, owe their clients a fiduciary duty "to exercise the utmost good faith in dealing with clients, to disclose all material facts and to employ reasonable care to avoid misleading clients." SEC v. Moran, 922 F. Supp. 867, 895-96 (S.D.N.Y. 1996); see also Capital Gains, 375 U.S. at 191-94 (1963) (investment advisers owe "an affirmative duty of utmost good faith, and full and fair disclosure of all material facts . . ."). It almost goes without saying, that if you steal your clients' money to fund gambling junkets or to buy a car and then lie to your clients about the negative performance that you are achieving while investing their funds, you have failed to "exercise the utmost good faith in dealing with your clients." See, e.g., SEC v. Saltzman, 127 F. 2d. Supp. 660, 670 (E.D. Pa. 2000) (allegations that general partner of an investment fund organized as a limited partnership fraudulently took personal loans in violation of the partnership agreement stated a claim under Sections 206(1) and (2) of the Advisers Act); Sheldon Company Profit Sharing Plan & Trust v. Smith, 828 F. Supp. 1262, 1284 (W.D. Mich. 1993) (holding that an investment adviser violated Sections 206(1) and 206(2) of Advisers Act when he instructed a

brokerage firm to issue checks from client accounts to companies controlled by the adviser); SEC v. Gotchey, No. 91-1855, 1992 WL 385284, *2 (4th Cir. 1992) (affirming final judgment and permanent injunction under Sections 206(1) and (2) against investment adviser who misappropriated client funds).

### 3. Mathur and Entrust Acted with Scienter

Mathur and Entrust acted with a high degree of scienter. They made direct misstatements as to the performance of their trading activities to the Core Investors and intentionally misappropriated investor funds for Mathur's direct personal benefit.

### B. Mathur and Entrust Also Violated Section 17(a), Section 10(b) Rule 10b-5

A violation of the antifraud provisions of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 hereunder occurs when a defendant: (1) makes false and misleading misstatements or omissions of material fact, (2) in connection with the offer, purchase or sale of securities, and (3) acts with scienter. Basic, Inc. v. Levinson, 485 U.S. 224, 235 n.13 (1988). All three elements are present here.

Mathur and Entrust made false statements to the Core Investors as to what was happening to their investments. Mathur and Entrust told these clients that their funds were being invested, their principal was protected, and that they were obtaining substantial returns. In fact, however, the firm was experiencing losses in its trading activities and the firm and Mathur were dissipating their clients' investments through misuse and misappropriation. The Supreme Court recently noted with approval that the Commission "has maintained that a broker who accepts payment for securities that he never intends to deliver, or who sells customer securities with intent to misappropriate the proceeds, violates § 10(b) and Rule 10b-5." SEC v. Zandford, 535 U.S. 813, 819 (2002) (citing with approval In re Bauer, 26 S.E.C. 770, 1947 WL 24474 (1947)).

16

### C. There is a High Likelihood that Defendants Violations Will Be Repeated

Mathur's and Entrust's fraudulent activities date back to at least September 2001, and they have occurred on a regular basis up through the present. In early 2005, Mathur and Entrust sent out a new round of phony statements to the Core Investors in which they continued to represent that everything was fine and their investments were generating great returns, when in fact the firm's trading activities had realized double-digit negative returns in 2004 and much of the clients' money was gone through misappropriations and misuse. Bank records reveal that Mathur has continued to misappropriate client funds for his own personal benefit even after the SEC began its inquiry into this matter in January 2005. On March 17, 2005, Mathur cashed a $70,000 check drawn on AMR Realty's bank account at the MGM Grand Casino. (Primavera Decl. at ¶ 26.) He also wrote a $23,000 check to the same casino from the Entrust bank account on March 29, 2005, two days before he appeared for testimony at the SEC and asserted his Fifth Amendment rights and refused to answer any substantive questions. (Ex. A to Primavera Decl.; Primavera Decl. at ¶ 21.) Two weeks ago, after learning of the SEC inquiry, Phillip Massad contacted Mathur and told him he wanted to withdraw $225,000. (King Decl. at ¶ 18.) Mathur made no mention of any problems and told Massad that it would be "no problem." Mathur did so, even though according to Entrust internal records, Massad's investment was only worth $112,000 at year end. (Ex. A to Leung Decl.) As of April 8, 2005, Massad has received no money from Entrust or Mathur. (King Decl. at ¶ 18.)

2.  **In Addition To Injunctive Relief, An Order Freezing The Defendants' Assets And Ordering Other Equitable Relief Is Also Necessary And Appropriate.**

   A.  **An Asset Freeze and a Court-Ordered Accounting Are Necessary and Appropriate**

This Court may order ancillary relief to effectuate the purposes of the federal securities laws and to ensure that wrongdoers do not profit from their unlawful conduct. SEC v. Drexel Bunham Lambert Inc., 837 F. Supp. 587, 613 (S.D.N.Y. 1993); Unifund SAL, 910 F.2d at 1041; Manor Nursing Centers, Inc., 458 F.2d at 1103. Such ancillary relief may include a temporary freeze of assets to assure that any final judgment which might ultimately be ordered can be satisfied. Pinez, 989 F. Supp. at 336; Unifund SAL, 910 F.2d at 1041; SEC v. International Swiss Investments Corp., 895 F.2d 1272, 1276 (9th Cir. 1990); SEC v. Current Financial Services, Inc., 783 F. Supp. 1441, 1443 (D.D.C. 1992). The courts have recognized that a disgorgement order may be rendered meaningless unless an asset freeze is imposed prior to the time of entry of final judgment. See SEC v. Lauer, 52 F.3d 667, 669 (7th Cir. 1995) (affirming preliminary injunction "designed to freeze the defendants' assets with a view to eventual disbursement to the ultimate victim of the fraud"); Pinez, 989 F. Supp. at 336 (court may impose an interim asset freeze to preserve a basis for remedies such as disgorgement). See also United States v. Cannistraro, 694 F. Supp. 62, 71 (D.N.J. 1988), aff'd in part and vacated in part on other grounds, 871 F.2d 1210 (3d Cir. 1989); SEC v. Vaskevitch, 657 F. Supp. 312, 315 (S.D.N.Y. 1987).

The Court should also freeze Relief Defendant AMR Realty's assets up to the amount of its unjust enrichment, which would encompass all of its assets. As set forth above, AMR Realty received approximately $1 million from investor funds. It has no claim to these funds as they belonged to investors.

The Commission respectfully requests that this Court freeze all accounts and assets over which Mathur, Entrust, and/or AMR Realty: (i) have a direct or indirect beneficial interest, or (ii) exercise direct or indirect control. The Commission's proposed asset freeze order is necessary and appropriate to prevent further misappropriation or dissipation of assets and to ensure that funds are available to satisfy an eventual judgment for disgorgement or penalties. As discussed above, Mathur has continued to misappropriate client funds even with knowledge of the SEC investigation.

The Commission also respectfully requests that this Court order an accounting of all assets of Mathur, Entrust and AMR Realty and any entity they directly or indirectly control. In light of Mathur's commingling of his clients' assets with those of Entrust and AMR Realty, such an accounting is necessary to identify the location of all proceeds of the fraud and the relevant custodians of additional assets on whom the proposed freeze order should be served.

### B. Mathur, Entrust and AMR Realty Should Repatriate Client Funds From Overseas

As described in the Declaration of Agent Waker, Mathur has been observed sending tens of thousands of dollars of cash overseas through a package delivery service and other unconventional means. Much of the client money that Mathur has misappropriated was though cash withdrawals from Entrust's and AMR Realty's bank accounts. There is a concern that Mathur has sent misappropriated client money overseas, and thus, the Commission requests that Mathur, Entrust, and AMR Realty be ordered to return such money to the United States and deposit it in the registry of the Court for safe keeping.

### C. An Expedited Discovery Schedule Is Necessary and Appropriate

The Commission seeks to depose Mathur and other witnesses, request documents and answers to interrogatories, subpoena documents from third-parties and take other discovery on

an expedited basis prior to the preliminary injunction hearing. Fed R. Civ. P. 30, 33, and 34 expressly give district courts the power to order expedited discovery where, as here, the normal pace of pre-trial proceedings will irreversibly prejudice the just and efficient determination of the action. Such discovery is necessary to present a complete evidentiary record to the Court and will sharpen and focus the issues to be decided at such hearing. Accordingly, the Commission requests that expedited discovery be permitted in the manner described in the proposed order.

### D. An Order Preventing Alteration or Destruction of Documents Is Necessary and Appropriate

To protect all documents necessary for full discovery, the Commission seeks an order preventing the alteration or destruction of documents. Given the serious nature of the violations in this case such relief is especially important. An order preventing alteration or destruction of documents is thus necessary and appropriate to protect the integrity of this litigation.

### CONCLUSION

For the foregoing reasons, it is respectfully requested that the Court grant the relief requested herein. A proposed order is attached.

Respectfully submitted,

R. Daniel O'Connor   (Mass. Bar. No. 634207)
Senior Trial Counsel
oconnord@sec.gov
Steven Y. Quintero   (Mass. Bar No. 632079)
Branch Chief
quinteros@sec.gov
Risa A. King          (Mass. Bar No. 648217)
Enforcement Attorney
kingr@sec.gov
Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
73 Tremont Street, Suite 600
Boston, MA  02108
(617) 573-8900
(617) 424-5940 (facsimile)

Dated: April 12, 2005